Good morning, Your Honors. Caitlin Howard, Federal Defenders, on behalf of Mr. Ramirez-Estrada. Mr. Ramirez-Estrada's convictions should be reversed. The District Court erred in admitting the multiple inspection referral slip in this case. It was erred because the referral slip qualified as hearsay, and there was no exception that applied. This admission of the referral slip prejudiced Mr. Ramirez-Estrada and likely impacted the verdict in this case. For that reason, the government cannot prove that this error was harmless. The multiple inspection referral slip included a statement, an out-of-court statement made by Officer Ponce de Leon, the primary inspection officer at the San Ysidro Port of Entry. He had handwritten the statement on the multiple inspection referral slip. There was no exception that applied to this multiple inspection referral slip. It was not an admission by a party opponent, and as Mr. Ramirez-Estrada never manifested an adoption of that statement. He didn't sign the statement. Was the written document redundant to his testimony? Your Honor, Officer Ponce de Leon testified as to what Mr. Ramirez-Estrada said to him, or his version of what Mr. Ramirez-Estrada said to him. The slip actually bolstered and corroborated that testimony and was used by the government in opening, closing, and introduced twice during the trial through two different witnesses. So it was not ---- It didn't say anything different. It did not say anything different, Your Honor. It corroborated the testimony. However, it still remains the evidence here. The Supreme Court in Tom stated that the prior consistent statement exemption to the hearsay rule is not appropriately used as an impeachment for all purposes. It is really only used in a narrow set of circumstances where there is an allegation made of recent fabrication or undue influence or improper motive in the testimony. Well, there was an allegation made that his memory wasn't good enough, that he didn't remember what happened during that time. Now, there was a separate set of allegations made that he didn't understand Spanish well enough, but the form really wouldn't speak to that one way or the other because he wrote down what he understood. The only way I could see the form having any impact is in response to the argument offered by defense that his memory wasn't good enough and he's coming up, well, this is what I wrote at the time. So it seems to me either direction, either it is potentially admissible as a prior consistent statement in the face of the defense challenge, or it didn't make any difference. Because if he's already testified to exactly the same thing and all this is is a redundant reaffirmation of that, what difference does it make? Why isn't that harmless? Your Honor, I don't believe that this statement qualified as a prior consistent statement under that exception. I think that that exception requires a level of impeachment that specifically attacks. Why isn't failing memory count? In fact, that's how it gets used probably most often. Somebody winds up saying, I don't remember the details, but I wrote it down at the time. In that instance, it might come in as a prior recollection recorded, but it gets in. Your Honor, it has to come in after an allegation of a recent fabrication. It has to come in to rebut that allegation of a recent fabrication or an improper motive. Well, not just fabrication. Failing memory. Why doesn't failing memory work? I believe that in Tom, the Supreme Court made clear that there is a specific type of impeachment for which prior consistent statement applies. And there is a specific type for which it does not. And I think failing memory is a standard type of impeachment, particularly in a case like this, where the testimony was that he had seen 140,000 people approximately since Mr. Ramirez Estrada came through the port of entry. And it doesn't just speak exactly to that problem. I mean, you acknowledge that you could have a prior recollection recorded. Doesn't this speak exactly to the defense argument that you're not going to remember this particular individual clearly enough? And he can say, look, I wrote it down at the time. I don't believe it rebuts an allegation of a recent fabrication or an improper motive or influence. In the cases in which prior consistent statement has been analyzed, such as Frederick's and Coleycott, I think that in those cases what we're looking at is that there's a motivation to lie, to make up the testimony, and whether or not it rebuts an allegation that the testimony was recently fabricated. I don't think that that is the situation presented here. I think that the impeachment of Officer Ponce de Leon was outside of that exemption. And I think that even to Your Honor's other point, which is that it was redundant and did not make any difference, I disagree because the main issue in this case is the credibility of these two witnesses. The only witnesses who testified as to what happened during that interaction on January 4th, 2011, were Mr. Ramirez Estrada and Officer Ponce de Leon. Officer Ponce de Leon testified that Mr. Ramirez Estrada told him that he was a United States citizen, told him that he was going to San Diego, and that he was born in Las Vegas, Nevada. Mr. Ramirez Estrada testified that those things were not true, and that, in fact, he had gone to the port of entry to get medical treatment. He had, and both, this is uncontested, that he had presented Officer Ponce de Leon with a Mexican identification card with his true name on it, that he recognized that he had previously been deported from the United States, and that he went to the primary inspection booth, and that he provided this documentation with his true name. Also, two doctors, medical experts testified, one who had seen Mr. Ramirez Estrada in 2006, and another who had seen Mr. Ramirez Estrada in 2011 after his arrest. Both doctors testified to the existence of this jaw injury, to the fact that he had not received medical treatment for it, and that it would require surgery to repair, and that it would cause Mr. Ramirez Estrada pain. And they testified as to different varying levels of pain that it would cause. And so the jury, in its deliberations, had to decide who to believe. Was it Mr. Ramirez Estrada, or was it Officer Ponce de Leon? And when we look at the questions that the jurors asked, they posed six questions. It's titled seven, but there's actually only six questions that the district court found. And four of those six questions relate to this interaction that took place between Officer Ponce de Leon and Mr. Ramirez Estrada, and the testimony of Officer Ponce de Leon. He was impeached with basically a report, and that's what two of the questions relate to. The third question relates to whether or not there were additional forms other than the multiple inspection referral form. So they specifically asked a question about that referral form. And then the other two questions were about whether or not there was a translator available and whether or not there was any testimony about what language that encounter occurred in. So the jurors clearly deliberated on these points, on this interaction, on what happened between these two people. And credibility was a huge part of this case. It was the entire case. We didn't contest that Mr. Ramirez Estrada wasn't a U.S. citizen or that he hadn't been deported before. The only contested issues are what he went to the port of entry for. And so because of that, the admission of the multiple inspection referral slip additionally bolstered and corroborated Officer Ponce de Leon's testimony. In addition to that, it was used in opening statement. It was introduced two times during direct testimony. And it was used again in rebuttal closing argument twice. And the way in which the government used it was to say that it was, it corroborated this testimony. I guess I just have never quite understood the jaw injury testimony. He approached the border and the guards and the inspection station and said that he needed help with his jaw? Yes, Your Honor. He thought that the people at the inspection station were going to fix his jaw? I just, I'm not understanding the theory. Your Honor, what he testified to was that in 2009 he had been sentenced in another illegal reentry case in front of Judge Sobraw. And at the sentencing hearing, Judge Sobraw recommended to the Bureau of Prisons that he receive medical treatment for this jaw injury. And it's outside of the record, but there was a whole lot of litigation related to this jaw injury in that case. And so he never received that medical treatment. And he was released from prison and deported back into Mexico. Mr. Ramirez Estrada testified that he had gone to try to get medical help in Mexico for the jaw injury. And that because of Judge Sobraw's recommendation and the failure to fix it while he was in custody in the United States, that that's why he went to the port of entry, to ask the representatives of the United States government for assistance with this jaw injury. And I believe I only have about 15 seconds left, if I could reserve that. We'll give you a minute for rebuttal. Thank you. And we'll hear from the government. May it please the Court. Good morning. My name is Ann Perry, and I represent the government in this case. With regard to the multiple inspection referral slip, this is a document that is routinely used to simply document the passage of an individual from primary to secondary inspection in any given case, which is pretty much what happened here. The Court will recall from the briefing in this case that Officer ---- Was there any dispute over the fact that he was referred from primary to secondary? No. We're not going to dispute that. So that didn't speak ---- that isn't why it was being used here, was it? It was used for a couple of reasons. First of all, Officer Ponce de Leon had a little bit of a hard time on the stand. It's referred to at the very beginning of his testimony that he didn't remember the defendant's name. That's true. If you look at the same part of his testimony in the transcript, I asked him at that time, is this your first time testifying in court? A transcript, as Your Honors well know, doesn't always reflect exactly what happened in court. In this case, the young officer simply froze. He did fill out the multiple inspection referral slip in this particular case. He also did testify as to his interaction with the defendant. You have heard and seen in the briefing that there was some question about the officer's ability to speak Spanish. He had his training from the ---- I believe it was from FLETC, and he also had on-the-job training for more than two and a half years. There was actually no question throughout the case that there was any problem in communication. It was simply alleged as part of the defense in this case. He was actually asked on, I believe it was both direct and cross-examination, if the defendant had said anything to him about his health condition, and he said no, he did not recall that. The statement that was elicited in the or that was written down on the multiple inspection referral report, we believe, Your Honor, is at best harmless error, because it simply restates what the officer already testified to in court. And, in fact, it made mention of the fact that the defendant had said he was from Las Vegas. The defendant confirmed, or that he, I believe he was born in Las Vegas. The defendant, when he took the stand, indicated that he had lived in Las Vegas, which was some confirmation of both what was in the multiple inspection referral slip and also what Officer Ponce de Leon had said that the defendant had told him. In any event, this particular slip was simply cumulative of Ponce de Leon's testimony. It was not in and of itself so significant as to warrant reversal in this case. Go ahead, sir. Go ahead. I was going to say, why was it necessary for it to be admitted? Couldn't he have just reviewed it to refresh his recollection if he had memory problems that day? That is true. It could have been. It could have been. Because you have a jury later on asking a question about whether there were more forms that they could look at, obviously attaching some degree of significance to the multiple inspection referral slip. Probably, and, of course, I didn't talk to the jurors, but one must assume that it was because it did have information that were statements attributed to the defendant. And that is truly, I think, the reason for it. He was convicted of illegal reentry? It was attempted illegal reentry as well as false claim to United States citizenship. He was convicted of both. That is correct. So what was on the – what he said was critical for the – for at least the false claim. I don't know that it was critical, but it was what we would say is cumulative, assuming that the jury believed what the officer had to say, because that's what he said. But he said it – he said it after reading the form. The officer actually did remember the statement about being from Las Vegas. I think maybe because in his many, many encounters with individuals, maybe people don't say that all the time. It wasn't the form that had him recall that particular part, if I recall the testimony correctly. However, the form had that information. Would the Court like me to address the additional Doyle argument? I would. And I think Professor got a particular interest, because I struggle with this. It doesn't seem to fit. This is the right to counsel. And it seemed to me the significant part of the testimony that was being offered didn't relate to what the defendant said. It's what he didn't say. That is, he didn't identify the job problem. How is that not commenting on silence after he's claimed his right to counsel? I have two responses. One, I must give a preface. Before making his ruling, allowing that this testimony was even to be elicited, Judge Houston did review the video in this case, which is at Excerpt of Record 259. And I would encourage this Court to do that as part of its review in this case. In this case, as the Court might recall, initially, there were the defense had filed a motion to suppress the statements. And Judge Houston ruled on that motion because the government said we weren't going to put anything in, save and accept if the defendant chose to testify. The testimony in this case was as follows. The officer testified that she asked the defendant if he had any health problems. He responded, no. She said, do you have any scars or tattoos or broken bones? And he said, I have a broken nose. That's it. This can readily be distinguished from Doyle. It can be readily distinguished from Caruto in that the defendant was not being asked about issues that he had elected to remain silent on. He made a response to health questions. I might also note respectfully, Your Honor, that these were routine booking questions, and they only became significant in this case because the defendant brought it up as part of his defense. In the Southern District of California, health-related questions become very critical because they are a part of where the individual goes. You are all familiar with the fact that we have a lot of people that go through the criminal court system. So the health questions become very, very important. None of these health questions had anything to do with his alienage. None of them had anything to do with his parentage. Those questions were not asked. They were not asked of the witness. They had been asked by the witness to the defendant, but those had nothing to do with the health issue that he specifically raised in his direct testimony. End of cross. And yet it wasn't offered in evidence because of health-related reasons. It was offered in evidence to try to rebut his claim that he was coming for his job problem using his silences, the fact that he did not say anything about his job problem at that time. And that's the part that it's a fact pattern that I haven't seen before. I'm having trouble understanding why that doesn't constitute a violation of his right to remain silent. The jury is being told he didn't say anything. And for him to try to explain later requires him to offer up the issue of whether he was exercising his right to remain silent, which is something you can't argue on. I still think we're dealing with Pennsylvania v. Eglalitas Muniz when we're talking about routine booking questions, Your Honor. He had been advised of his right to remain silent, and there were no questions that were asked of him about his entry into the United States. As I say, there may have been some questions about his parentage, but none of that was in the evidence and that wasn't asked. If the Court views the video in this case, I believe the Court will see the nature of the questioning and how the defendant responded to those questions. The defendant wasn't in a position to comment on silence. He was asked specifically just these two questions. The officer was asked two questions. Did he say anything to you about having specific health problems? No. The state of his health was not an issue of his criminal case at the time that the officer asked the questions. It became relevant. I understand that, Your Honor. But at the time that the officer was asking the question as to his health, it had only to do with booking, a routine matter which is allowed under Miranda. So we're expected then to focus on the intent of the officer in asking the questions, even though it may turn out that a somewhat innocuous question yields an answer that's of great value to law enforcement after Miranda warnings have been invoked or Miranda rights. What we have, Your Honor, is simply what happened. And as I indicated, in our district, they have to ask these questions. They're routine and they have to because it determines the placement of this individual. If he had said, again, I don't want to go too far afield, but if he had said I have this terrible jaw problem and I have to see a doctor or any of those things, then there would have been a completely different disposition of what happened to him on the night of his arrest. It never even would have come up had he not testified that the only reason was that he came in for this help and that he was desperate and that he was in pain. Those were affirmative allegations that he made. And when you say testified. Yes. Well, he testified to that. He testified that he was desperate and in pain. Yeah. Okay. So clearly it's okay to ask, but it may not be okay to use. In certain cases, Your Honor. But again, this was for purposes of impeachment to go directly to what he told the court and the jury was his reason for coming back in. I see my time is up. I see. Thank you. We promised you a minute. Thank you, Your Honor. I'll use my rebuttal time to address the Doyle issue. The only way in which Officer Nicasio's testimony became relevant was if the implicit argument by the government was that Mr. Ramirez-Estrada did not tell Officer Nicasio why he was at the port of entry, if that was what the jury was supposed to conclude from the introduction of that testimony. There was no dispute about whether or not Mr. Ramirez-Estrada actually had this jaw injury. Throughout its closing argument, the government conceded that multiple times. Don't use your sympathy, the government said. He has this jaw injury. It's very unfortunate, but that doesn't give him a right to break the law. So the question was not why Mr. Ramirez-Estrada didn't tell Officer Nicasio about this jaw injury. The issue was that he had invoked his right to remain silent, and so he had not given his reason for being at the port of entry. And that was the conclusion that the government was really asking the jury to draw. If his testimony was credible, if he was being truthful, he would have told Officer Nicasio about this jaw injury, but he did not. And therefore, he's not telling the truth today. There are circumstances where statements that otherwise would be barred by Miranda I've taken you over time, so I'll still look for an answer to the question. Statements that would otherwise be barred by Miranda can come in for impeachment purposes, and the government has identified the purpose of this as being impeachment. Why doesn't this qualify? I think that there are two separate issues, Your Honor. One is whether or not the government can comment on silence post-invocation. And the second is whether or not these statements could be used to impeach if they're not a comment on silence. First, I don't believe that this was proper impeachment, even if Your Honor's fine that there was no comment on silence. There was no contradiction or inconsistency in the testimony. If you review the questions asked by Officer Nicasio, they are so specific that they don't actually draw the answer related to the jaw injury. The two questions asked, the first was, do you have any health problems, like a heart condition or diabetes, to which he responds no. The second question is, do you have any scars or tattoos? And it remains unclear why his response to that was, I had a broken nose, because it's really not even responsive to the question. But certainly the fact that he testified to the jaw injury being the reason for his being at the port of entry was not inconsistent with those questions. As to the comments on silence, it does not make a difference that the questions could have come in for impeachment, because they weren't being used for impeachment. They were being used to comment on his silence after he invoked his right to remain, his right to counsel, thus indicating that he wanted to remain silent. And that is where the error exists, because the government was using it not to impeach him because he didn't tell about the jaw injury, because there was no dispute as to that. It was to comment on if this was true, why wouldn't he have told Officer Nicasio this when he was questioned after arrest? And the real reason is because he invoked his right to counsel. But the jury couldn't know that, because he would have had to choose between those two constitutional rights in order for the jury to know that. We thank you. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Tunheim, Schroeder, Clifton